UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

*In re*:

MAPLE LEAF CHEESE
COOPERATIVE,

        Debtor.

Case Number: 20-13006-11

---

MAPLE LEAF CHEESE
COOPERATIVE,

        Plaintiff,

    v.

MAPLE LEAF CHEESEMAKERS,
INC.,

        Defendant.

Adversary Number: 21-39

---

## **DECISION**

The issue before the Court is whether Plaintiff Maple Leaf Cheese Cooperative ("Cooperative") lacks standing to assert a claim against Defendant Maple Leaf Cheesemakers, Inc., for its failure to restore the Plaintiff's cheesemaking facility to its original condition after vacating the facility, in violation of Wis. Stat. § 704.05(4). For the reasons outlined below, this Court holds that the Plaintiff does have standing.

### JURISDICTION

The matter before the Court is a Motion to Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of standing ("Motion"). Section 10.3 of Debtor's Chapter 11 Plan says this Court retains jurisdiction

over this bankruptcy case "[t]o determine all questions and disputes arising under the Plan including those regarding title to or interests in the Reorganized Debtor's assets." Maple Leaf Cheesemakers, Inc., argues that, in its opinion, Claim I of the Complaint no longer belongs to Plaintiff and Plaintiff lacks standing to pursue Claim I.

Property of the estate is created upon commencement of a case. 11 U.S.C. § 541(a)(1). This Court has to answer the straightforward question of whether Claim 1 is property of the estate. Whether property is property of the estate is a question to be answered by a bankruptcy court. Further, Plaintiff's confirmed Plan provides for distribution of proceeds, if any, from the claims against Defendant, including Claim I. It is well settled the Bankruptcy Court retains jurisdiction over administration of the estate and interpretation and enforcement of the Order of Confirmation and Plan. Both will be affected by the Motion.

So the Motion turns on whether the Claim I claim against Maple Leaf Cheesemakers is property of the Debtor's bankruptcy estate. As a result, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

***Prepetition History of Relationship between Plaintiff and Defendant***

Plaintiff Maple Leaf Cheese Cooperative is a dairy cooperative. The Cooperative owned a cheese factory in Albany, Wisconsin, before moving to a facility in Monroe, Wisconsin ("Plant"), in 1994. The Cooperative owned the

Plant, the surrounding real estate, and considerable equipment located inside or appurtenant to the Plant. The Cooperative was exclusively owned by local farmers. But the Plant was managed and operated by Defendant Maple Leaf Cheesemakers, Inc. ("MLC"), from 1997 to about 2020. While managing and operating the Plant, MLC took custody of the Cooperative's patrons' milk to make cheese, employed staff that operated the Plant, and used the Cooperative's equipment. It also contributed equipment and other personal property associated with the cheesemaking operation.

In December 2020, MLC vacated the Plant. The Cooperative alleges that upon MLC's departure from the Plant, the Cooperative discovered extensive damage to equipment and to the Plant itself. According to the Cooperative, this includes: damage to the top heads of two silos based on improper winterization, many electrical safety code violations, an inoperable whey cream separator, and other physical damages. The Cooperative estimates necessary repairs and replacements would cost hundreds of thousands of dollars.

### *The Cooperative's Bankruptcy and Current Adversary Proceeding*

The Cooperative had been facing financial challenges in the years before its bankruptcy. It eventually filed its Chapter 11 petition in December 2020.

Debtor's Plan of Reorganization was confirmed ("Plan"). The Plan was a liquidating plan under which the Plant would be sold, and the proceeds generated from the sale of the Plant, the Plant's equipment, the Debtor's remaining accounts receivable, inventory, and other assets would be used to pay creditors. If no sale occurred during the sale period (defined as 60 days

from the Effective Date), the Plant and Plant equipment would be surrendered by the Debtor to its primary secured creditor, Bank of New Glarus ("New Glarus"), free and clear of all liens, claims, and encumbrances, via a quitclaim deed and Bill of Sale. No sale occurred during the Sale Period, and so as required under the Plan, the Plant was transferred to New Glarus at the end of the sale period.

The Plan reserved to Debtor the right to prosecute claims against MLC ("MLC Claims"). The "MLC Claims" are defined as "claims held by the Debtor . . . against MLC for breach of contract, property damage, business tort(s), bad faith, breach of fiduciary duties, and other related claims or causes of actions." According to the Plan, the bankruptcy estate ("Estate") would receive any proceeds from a successful prosecution of any of the MLC Claims. New Glarus's interest in the MLC property damage claims was not released and remained its collateral. Thus, any proceeds from those claims would first be paid to help satisfy New Glarus's claim.

About three and a half months post-confirmation, the Cooperative filed this adversary proceeding. The Cooperative asserts claims under Wis. Stat. § 704.05(4) for a failure to restore the Plant, breach of contract, breach of implied duty of good faith and fair dealing, breach of fiduciary duty, and an objection to MLC's Proof of Claim filed in Debtor's main bankruptcy case.

In response, MLC moved to dismiss Claim I—the Wis. Stat. § 704.05(4) violation. MLC argues the Cooperative lacks standing to assert such claims because it transferred the Plant and equipment to New Glarus. The Cooperative

4

objects, stating that the Cooperative expressly reserved its right to prosecute claims including any property damage claims against MLC.

## DISCUSSION

### *Legal Standards*

A motion to dismiss based on a lack of standing is analyzed as a matter of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, as well as Rule 7012 of the Federal Rules of Bankruptcy Procedure. *See Karass v. Stirlen (In re Stirlen),* 614 B.R. 837, 849 (Bankr. N.D. Ill. 2020) (citing *Rizzi v. Calumet City,* 11 F. Supp. 2d 994, 995 (N.D. Ill. 1998)). Questions of subject matter jurisdiction are threshold issues that must be examined by the Court before any other issue. *See In re J&B Haldeman Holdings, LLC*, 517 B.R. 910, 914 (Bankr. W.D. Wis. 2014).

The doctrine of standing determines whether a particular party is the proper person to pursue claims for federal court adjudication. *In re Lisse,* 565 B.R. 903, 910 (Bankr. W.D. Wis. 2017) (citing *Davis v. FEC,* 554 U.S. 724, 733 (2008)). Standing also focuses on whether the party has the requisite stake in the outcome of the dispute. *In re Lisse,* 565 B.R. at 910.

In the constitutional sense, standing to sue is an element of the case or controversy requirement of Article III of the Constitution. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish constitutional standing, a litigant must show: (1) that he or she has suffered an injury in fact; (2) that the injury is fairly traceable to the defendant's conduct; and (3) that the injury is likely to be redressed by a favorable court decision. *Id.* (citing *Lujan v. Defenders of*

*Wildlife,* 504 U.S. 555, 560–61 (1992)*,* and *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),* 528 U.S. 167, 180–81 (2000)). The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. *Spokeo, Inc. v. Robins,* 578 U.S. at 338) (citing *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231 (1990)).

The doctrine of standing also creates prudential limitations rooted in "matters of judicial self-governance" meant to ensure "courts only resolve disputes that are appropriate for judicial resolution." *Richardson v. Green (In re THR & Assocs., Inc.),* No. 12-72022, 2016 WL 3134653, at *6 (Bankr. C.D. Ill. May 26, 2016) (citing *Warth v. Seldin,* 422 U.S. 490, 500 (1975)). "A key tenet of prudential standing is that a party generally may not assert the rights of another person or entity." *In re THR & Assocs., Inc.,* 2016 WL 3134653, at *6 (citing *Kyles v. J.K. Guardian Sec. Servs., Inc.,* 222 F.3d 289, 294 (7th Cir. 2000)). The prudential limitations on standing are waivable and not jurisdictional. *In re THR & Assocs., Inc.,* 2016 WL 3134653, at *6 (citing *Rawoof v. Texor Petroleum Co.,* 521 F.3d 750, 756–57 (7th Cir. 2008)).

***Prudential Standing***

MLC first argues that the Cooperative lacks prudential standing because the Cooperative rests its claims upon the legal rights or interests of a third party. MLC suggests the Cooperative, after transferring its interest in its equipment and the Plant to New Glarus, no longer has a legally protected interest. As a result, the Cooperative is unable to pursue claims related to property under which it no longer has any ownership or equitable interest.

6

Whether a debtor has standing to pursue prepetition tort claims related to property the Debtor has transferred post-confirmation is one of first impression in this Court and other bankruptcy courts in the Seventh Circuit. But a recent Wisconsin Court of Appeals decision, *Pagoudis v. Keidl*, 2021 WI App 56, 399 Wis. 2d 75, 963 N.W.2d 803, is instructive.

In *Pagoudis*, a limited-liability company (LLC) that bought a home, a second LLC to which the LLC-purchaser transferred title to the home, the individual who owned both LLCs, and that individual's spouse, all brought action against the sellers of the home. They sued for breach of contract and various forms of common-law and statutory misrepresentation. The individual who owned both LLCs discovered undisclosed defects in the home after the LLC bought the home. The seller moved to dismiss the suit, arguing that none of the parties had standing the sue: the individual and the LLC-purchaser lacked standing because they no longer owned the home, and the transferee-LLC lacked standing because it was not a party to the transaction in which the alleged fraud occurred.

The Wisconsin Court of Appeals held that the purchaser's transfer of title did not divest the purchaser of standing to sue over the post-purchase discovery of defects. When considering whether the defect claims ran with the land or remained the property of the purchaser who discovered the defect, the court determined that "a cause of action concerning property, once accrued, is not lost simply because the property is conveyed." *Pagoudis*, 399 Wis. 2d at 89. Consequently, the cause of action for defective construction "did not 'run with

the land' but, rather, was owned by whomever owned the property, and thereby suffered injury, when the defects occurred." *Id.* at 88. The court reasoned the alternative, "that a party loses standing whenever it divests itself of the property interest forming the basis for a claim," produces "untenable" or even "absurd" results:

> Under such a rule, for example, a person in a car accident could not sell the damaged vehicle for scrap without destroying his or her claims against the party that caused the accident. Or, to employ an analogy closer to this case, a parent who purchased and conveyed a house to his or her child as a gift would, by virtue of the gift transfer, destroy any claim against the seller for undisclosed defects. This is not the law: we are unaware of any authority holding that a party seeking damages for diminished property value or cost of repairs, whether under contract or tort theories or both, automatically loses standing whenever it conveys the property at issue.

*Id.* at 87.

This Court agrees with the above reasoning. Any physical damages claim the Cooperative may hold against MLC is a "cause of action concerning property" like the cause of action for defective construction discussed in *Pagoudis*. The Cooperative owned the property and the claims for property damage on the petition date. As a result, the prepetition claim for failure to restore the Plant is property of the estate owned by the Debtor and did not run with the land when the Plant and equipment were transferred to New Glarus.

This finding is reinforced by Section 1123(b)(3) of the Bankruptcy Code as well as the language of the Plan itself. Section 1123(b)(3) states:

**(b)** Subject to subsection (a) of this section, a plan may—

    **(3)** provide for—

8

>  **(A)** the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
>
>  **(B)** the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest.

In other words, Section 1123(b)(3) explicitly authorizes a chapter 11 plan to reserve a debtor's right to pursue a cause of action belonging to a debtor or a debtor's estate. Section 1123(b)(3) provides "notice to creditors generally that there are assets yet to be liquidated that are being preserved for prosecution by the reorganized debtor or its designee." *Elk Horn Hold Coal Co., LLC v. Conveyor Mfg. & Supply, Inc. (In re Pen Holdings, Inc.)*, 316 B.R. 495, 500–01 (Bankr. M.D. Tenn. 2004).

 The plain language of the Cooperative's Plan makes such a preservation. First, Section 1.28 of the Debtor's Plan defines "MLC Claims" as "claims held by the Debtor." Second, Section 6.7 states that "[e]xcept as provided in the Plan, the Reorganized Debtor shall retain possession all of property (including the MLC Claims)." Third, Section 9.2 states that ". . . nothing herein shall bar MLC from asserting defenses or claims against the Debtor's accountants should the Debtor pursue the MLC Claims." All of these provisions serve as evidence that the Plan intended to reserve the Cooperative's right to pursue the MLC Claims.

 MLC retained experienced counsel who had the opportunity to review these Plan provisions. Counsel clearly understood that the Plan preserved to the Estate and Debtor the MLC Claims. In fact, in its objection to the Cooperative's Plan, MLC did raise jurisdictional concerns surrounding this

9

Court's ability to hear certain suits the Cooperative may intend on filing against MLC. However, at the Cooperative's Plan confirmation hearing on August 18, 2021, counsel for MLC stated that the only remaining objections MLC had pertained to Plan feasibility and bad faith. Thus, MLC withdrew its objection with respect to jurisdictional concerns it had surrounding potential lawsuits the Cooperative might file against MLC, including a claim for any physical damage done to the Plant.

Further, throughout the Cooperative's main bankruptcy case, MLC and its counsel were aware of the physical damage done to the Plant and the possibility of the Cooperative pursuing potential claims it had against MLC for such damage. It was clear throughout disputes between MLC and the Cooperative in the main case that the Plant experienced physical damage. And that, under the Plan itself, New Glarus would release any security interest in the MLC Claims it may have had except "to the extent the Debtor has any claims or causes of action against MLC relating to physical damages to the Plant." This language explicitly contemplates the possibility of Debtor pursuing a claim against MLC for physical damages to the Plant. MLC was aware the MLC Claims were not transferred. Cooperative was not divested of its ownership of those claims. Those claims accrued before any surrender or transfer of other collateral to New Glarus. The Cooperative suffered damages to its property when the injuries occurred.

Thus, this Court finds that the Cooperative has prudential standing to bring Claim I.

*Constitutional Standing*

MLC further alleges the Cooperative failed to establish in its Complaint two of the three requirements for constitutional standing: injury-in-fact and redressability.

First, MLC argues the Cooperative has failed to allege it suffered an injury-in-fact. MLC argues the Cooperative has not alleged that the Cooperative transferred its equipment and the Plant to New Glarus for a lesser value because of any physical damage to the Plant. And MLC asserts that because that Cooperative "receives no benefit from payment of any proceeds of the Excluded Physical Damage Claims to New Glarus," nor does the Cooperative have any liability to New Glarus for property damage, the Cooperative cannot assert it has been injured.

Second, MLC believes the Cooperative has not shown it will be redressed by a favorable court decision because any damages are the collateral of New Glarus and will be paid to New Glarus, not the Cooperative. According to MLC, the Cooperative "lacks standing because it no longer owns the property at issue, and it can only assert a remote interest in any proceeds from property damage claims, as any proceeds are fully secured by [New Glarus]."

While injury-in-fact and redressability are two separate requirements under a constitutional standing analysis, MLC's arguments for both requirements are unavailing for similar reasons. For both injury-in-fact and redressability, MLC's arguments ignore the fact that Section 1123(b)(3) statutorily authorizes a debtor to retain and enforce claims for the benefit of its

11

Estate. Here, the Plan's language makes it clear the claims are ultimately for the benefit of the Estate, as the Estate will retain the proceeds from any successful litigation of the MLC Claims. Section 2 of the Plan states that "[t]he Estate shall retain any proceeds derived from the prosecution of the MLC Claims." This includes any claims for physical damages. Although any proceeds would first be distributed to New Glarus to help satisfy its claim, this is no different than any debtor liquidating assets and then distributing proceeds in conformity with the Code and any plan.

MLC does not dispute that the Cooperative has standing to bring the remaining MLC Claims, even though the Cooperative will not retain the proceeds from the successful litigation of any of those claims either. The proceeds from the other claims the Cooperative has asserted against MLC also go to the Cooperative's Estate. That the proceeds from any successful physical damages claim would go first to satisfy New Glarus's claim before the remaining creditors does not mean it cannot benefit the Estate. As one court put it, "That the unsecured creditors will not receive every last dime of a successful recovery does not . . . mean that such a recovery would not benefit the estate." *Zahn v. Yucaipa Cap. Fund*, 218 B.R. 656, 665 (D.R.I. 1998).

So both injury-in-fact and redressability are demonstrated in the Cooperative's Complaint. First, to establish injury-in-fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is

12

"concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560 (internal quotation marks omitted).  !

Taking the facts alleged in the Complaint as true for the purpose of the present Motion to Dismiss, the Plant was extensively damaged following MLC's departure. The Cooperative estimates the damage to the Plant and its equipment require repairs and replacements that will likely cost hundreds of thousands of dollars. While the causation of and specific amount of damage is to be determined at trial, damage to the Plant likely led to a diminution in the value of the Plant and its equipment. According to the Plan, the liquidation proceeds from any sale or disposition of the Cooperative's assets include the "total net Cash proceeds generated from the sale or liquidation of the Plant, Equipment, and the Debtor's remaining accounts receivable, inventory, and DIP Account (after payment in full of the New Glarus Claim, taxes, any broker fees, utilities, and any other customary closing costs and title fees)." Given the damage that occurred, the liquidation proceeds generated from the sale of the Cooperative's assets are likely to be less than what they would have been had the damage not occurred. So the Cooperative, who is pursuing a cause of action for the benefit of its Estate, has demonstrated injury-in-fact.

For a similar reason, redressability is also shown. To satisfy redressability, a plaintiff must show "a likelihood that the requested relief will redress the alleged injury." *Domino v. Didion Ethanol, LLC,* 670 F. Supp. 2d 901, 917 (W.D. Wis. 2009) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103 (1998)). Courts have found standing to pursue a post-

confirmation action where the estate would benefit from a victory. *See, e.g.*, *Zahn v. Yucaipa Capital Fund*, 218 B.R. at 665-66. It is clear the Estate would benefit from any successful litigation of Claim I. Any damages recovered from this claim would increase the liquidation proceeds available for the Estate, thus redressing the alleged injury. A debtor holds a duty to maximize the value of its bankruptcy estate for the benefits of its creditors. To prohibit the Cooperative from pursuing this cause of action would be to prevent the Cooperative from fulfilling this duty.

## CONCLUSION

For these reasons, Defendant's Motion to Dismiss Claim I for a violation of Wis. Stat. § 704.05(4) is DENIED.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: June 14, 2022

BY THE COURT:

Hon. Catherine J. Furay
U.S. Bankruptcy Judge