## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

In the Matter of:

**MAPLE LEAF CHEESE COOPERATIVE**,

Debtor.

In Bankruptcy No.
20-13006-cjf
Chapter 11

- - - - - - - - - - - - - - - - - - - - - - - - -

**MAPLE LEAF CHEESE COOPERATIVE**,

Plaintiffs,

Adversary Proceeding No. 21-00039

v.

**MAPLE LEAF CHEESEMAKERS, INC.**,

Defendant.

### DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Defendant, Maple Leaf Cheesemakers, Inc. ("MLC") by their counsel, Scott G. Salemi and Kristin K. Beilke of Murphy Desmond S.C., hereby responds and submits the following proposed findings of fact and conclusions of law:

### PROPOSED FINDINGS OF FACT[1]

1.     Maple Leaf Cheese Cooperative ("Coop") was a dairy cooperative with a principal place of business at a cheese factory that it has owned since 1994, located at N890 Twin Grove Road, Monroe, Wisconsin 53566 ("Plant").

2.     The Coop is comprised of Patrons and has a Board of Directors and elected Officers.

3.     The Patrons include those with higher education degrees, who run and operate their own farming businesses, do their own bookkeeping, budgeting, recordkeeping, hire

---

[1] The Proposed Findings of Fact are taken from the sworn deposition of testimony of the Coop Fed. R. Civ. P. 30(b)(6) designee, its President Jeremy Mayer. The designated testimony of Mayer is Defendant's Exhibit 106 and is substantive evidence pursuant to Fed. R. Civ. P. 32(a)(3).

professionals, hold their own investment accounts and have sold milk with other cooperatives.

4.     The Coop made money for its Patrons through the sale of its cheese and the byproducts, cream and whey. (Mayer Dep. 56:21-25; 57:1-2.)

5.     Maple Leaf Cheesemakers, Inc. ("MLC") is a corporation in the business of cheesemaking with its principal place of business located at 704 30th Street, Monroe, Wisconsin 53566.

6.     The Coop hired MLC specifically as an independent contractor to provide "Cheesemaker Services" as defined in a written Cheesemaking Services Agreement dated April 15, 2008 ("Agreement"), a copy of which is attached to the Complaint as Exhibit A.

7.     Under the Agreement, among other things:

   a.   MLC was to make cheese from the Coop's patrons' milk, and the Coop would pay MLC 13% of the cheese and cream sales proceeds;

   b.   MLC was an independent contractor providing Cheesemaker Services; (Para. 1 and 4 and Mayer Dep. 39:4-6, 10-11);

   c.   The Coop had the "sole authority for the sale of the cheese produced" (Para. 7A); and

   d.   The Coop's limited responsibilities are identified in the Agreement at Para. 5.

   e.   The limited responsibilities of MLC are identified in the Agreement at Para. 6.

   f.   The Agreement provides at Para. 9 that it "shall supersede all prior agreements and understanding between the parties respecting the subject matter thereof. No representations of statements made by any representative of the Cooperative or the Cheesemakers which are not stated herein shall be binding.

The provisions hereof, including an executed attachments and addenda, constitute the entire agreement between the parties. No modifications additions, to or amendment of the Agreement shall be binding unless in wiring and signed by the parties."

8.    The Agreement was NOT a lease (Mayer Dep. 44:11-13.)

9.    The Agreement does NOT provide that MLC was a manager or business manager of the Coop, nor does it suggest such. (Mayer Dep. 156:15-21.)

10.    The Agreement does NOT provide that MLC was a sales agent of the Coop, nor does it suggest such. (Mayer Dep. 113;5-8; 156:22-25.)

11.    The Coop always knew it had the option of providing notice and terminating the Agreement. (Mayer Dep. 173:10-25.)

12.    If the coop felt they were losing money because of the Agreement or because of the nature of the sales of their cheeses to MLC or MLC entities, the Coop was always aware of the option of terminating the Agreement. (Mayer Dep. 173:19-25)

13.    There is no document known to the Coop wherein MLC is identified as an agent or fiduciary. (Mayer Dep. 167:25; 168:1-4.)

14.    From April 15, 2008 through November 2019, the Coop supplied all of the milk used by MLC for cheesemaking.

15.    The milk supplied by the Coop included milk the Coop purchased from others (ie. non-patron milk, or purchased milk).

16.    From April 15, 2008 through November 2019, the Coop voluntarily entered contracts with suppliers for the purchase of non-patron milk. (Mayer Dep. 194:22-25; 195:1-3.)

17.      The Coop has always known that it could stop purchasing non-patron milk at any time. (Mayer Dep. 143:16-19.)

18.      The Cooperative understood that as long as the Plant operated within maximum efficiencies, the more milk processed, the more cheese made, the more revenue to the Coop. (Mayer Dep. 190:19-23.)

19.      Prior to November of 2019, the Coop owned all of the milk that went into the Plant and cheese made from it. (Mayer Dep. 132:17-21)

20.      The Coop understood that MLC processed Coop milk even though the demand was low. (Mayer Dep. 59:21-24.)

21.      A cooperatives may ask patrons to leave because it cannot handle the amount of milk it is receiving from patrons (Mayer Dep. 51:5-11.)

22.      A cooperative may ask patrons to decrease the amount of milk the patron submits for processing to the cooperative (Mayer Dep. 51:12-16.)

23.      MLC never once refused to accept and process Coop milk. (Mayer Dep. 59:12-16.)

24.      (Prior to a 2020 Amendment), the Coop had always been responsible for all production costs for the cheese, including costs for processing of non-patron milk, as well as for milk powder, peppers, bags, pouches, boxes, pickle tank. (Mayer Dep. 80:25; 81:1-4; 195:4-6.)

25.      MLC was not obligated to market for sale the Coop cheese. (Mayer Dep. 86:1-13.)

26.      The Agreement does not provide for the sale of Coop cheese, other than that the Coop had "sole authority for the sale." (Agreement Para. 7A)

27.      After 2008, the Coop knew that all of its cheese was being purchased by either MLC or Maple Leaf Sales, Inc. ("Sales") (Mayer Dep. 118:19-24.)

28.     At any time the Coop could have refused to sell its cheese to MLC or Sales. (Mayer Dep. 123:3-6.)

29.     Neither MLC nor Sales prevented the Coop from selling its cheese to someone else (Mayer Dep. 127:12-17.)

30.     There was no contractual obligation for the Coop to sell its cheese to MLC or Sales (Mayer Dep. 130:22-24.)

31.     If at any time the Coop was not satisfied with the amount of money it was getting for its cheese, the Coop knew that could have sold its cheese in the market and face the associated risks of such. (Mayer Dep. 134:12-19)

32.     The Coop knew the prices being paid to the Coop for its cheese. (Mayer Dep. 134:8-11)

33.     The Coop sold its cheese based upon a price agreed upon between the Coop and MLC. (Mayer Dep. 65:16-20.)

34.     The Coop's cheese sale price was approved by the vote of the Coop board monthly (Mayer Dep. 139:23-25.)

35.     The sales price of the Coop's cheese was based upon the Chicago Mercantile Exchange ("CME") plus a premium (Mayer Dep. 66:1-5, 18-24.)

36.     Every month MLC informed the Coop of the pounds of cheese made and the per pound sales price (Mayer Dep. 67:20-23.)

37.     Every month the CME published block and barrel cheese pricing (Mayer Dep. 67:24-25; 68:1-2.)

38.     Every month MLC provided the CME numbers for block and barrel cheese prices to the Coop board members (Mayer Dep. 68:3-6.)

39.    The Coop board also knew where to go to get CME numbers for block and barrel cheese prices (Mayer Dep. 68-7-9.)

40.    The Coop routinely entered contracts and directly sold its cream and whey to third-party purchasers (Mayer Dep. 70:11-14, 25; 71:1-3; 104:1-7, 16-24)

41.    Even though there may be discussions and proposals between MLC and the Coop, the Coop knew it had the power to do whatever it wanted to do. (Mayer Dep. 112:4-9.)

42.    At times, the Coop Board waited until MLC representatives left the meeting before concluding the meeting in order to address issues outside the presence of MLC (Mayer Dep. 152:14-24.)

43.    MLC had no voting rights regarding Coop board decisions (Mayer Dep. 152:25; 153:1-2.)

44.     The Coop had the opportunity to reject Plant projects suggested by MLC. (Mayer Dep. 99:24-25; 100:1.)

45.    The July 17, 2018 withdrawal of $199,832.39, the Coop alleges was an unauthorized transaction, was in fact a withdrawal to correct a deposit of two checks on July 16, 2018 from the Coop's Payroll Account in the amounts of $190,217.32 and $9,615.07, made out to MLC for cheesemaking services and mistakenly deposited into the Coop's Whey Account. The withdrawal of $199,832.39 was made to MLC's account to correct that error.

46.    The June 8, 2018 withdrawal of $289.22 the Coop alleges was an unauthorized transaction, was in fact a withdrawal from the Whey Account into the Coop's Whey & Cream Income savings Account.

47.     The August 17, 2015 withdrawal of $27,587.53 the Coop alleges was an unauthorized transaction, was a withdrawal from the Whey Account into the Coop's Expense account on the same date.

48.     The Coop hired Peters & Peters, CPA as their accountants and bookkeepers (Mayer Dep. 68:14-17.)

49.     MLC would give Coop bills to the Coop treasurer or Peters & Peters at the direction of the treasurer, and they would pay them (Mayer Dep. 168: 5-11.)

50.     Peters & Peters had access and oversight over every single Coop bank account (Mayer Dep. 69:9-11.)

51.     Peters & Peters verified transactions with MLC every month (Mayer Dep. 69:12-14.)

52.     Every month, Peters & Peters received written reports from MLC regarding every facet of the operation of the plant and the sale of cheese (Mayer Dep. 69:15-19.)

53.     Peters & Peters verified the sales of the Coop's cheese to Sales (Mayer Dep. 69:24-25; 70:1-2.)

54.     Peters & Peters calculated and issued patron milk checks as directed by the Coop board, and issued the patrons' milk checks from the Coop's bank accounts (Mayer Dep. 71:7-18.)

55.     Peters & Peters acted as a consultant in regard to finances or business affairs of the Coop (Mayer Dep. 74:23-25; 75:1-2, 15.)

56.     Peters & Peters balanced bank accounts for the Coop monthly. (Mayer Dep. 75:16-19.)

57.     Peters & Peters directly paid suppliers, vendors, and sometimes contractors doing work at the Plant (Mayer Dep. 75-20-23.)

58.     In October of 2019, the Coop terminated its purchased milk contract with Rolling
Hills, informed MLC it would no longer be purchasing milk, and also notified MLC of the
Coop terminating the 2008 Cheesemaking Services Agreement. (Mayer Dep. 202:7-21.)

59.     Thereafter, from November 2019 until December 2020, MLC purchased non-patron
milk for cheesemaking.

60.     On April 16, 2020, the Parties amended the Agreement ("Amendment").

61.     There is nothing in the Amendment that suggests MLC was a sales agent (Mayer Dep.
157:7-10.)

62.     There is nothing in the Amendment that suggests MLC was a manager or business
manager for the Coop (Mayer Dep. 157:1-6.)

63.     There is nothing in the Amendment that required the Coop to sell its cheese to Sales
(Mayer Dep. 64:20-23.)

64.     On October 8, 2020, MLC provided the Coop with a 60-day written notice that it was
terminating the Agreement and Amendment.

65.     The first week of December 2020, MLC packaged the last run of cheese products.

66.     On December 9, 2020, the Coop filed its Chapter 11 bankruptcy petition.

67.     The Coop hired Rachael Stocker as a property manager to oversee and winterize the
Plant.

68.     On December 12, 2020, members from MLC and members from the Coop, Jeremy
Mayer, Brad Timm, Harvey Disch, in addition to Doug Peterson from Cheese Manufacturing
Specialist conducted a walkthrough of the Plant to identify what needed to be done to
winterize the Plant.

69.     The Coop took sole possession of the Plant after December 2020, and restricted access by MLC thereafter.

70.     On February 16, 2021, MLC filed its proof of claim in the amount of $182,155.24 in the Coop's bankruptcy case, a copy of which is attached to the Complaint as Exhibit C.

## PROPOSED CONCLUSIONS OF LAW

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), and (C).

3.     Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

4.     MLC and the Coop did not have a landlord-tenant relationship.

5.     The Agreement and Amendment were not leases.

6.     As to Claim I, the Coop's allegations of liability are based solely upon Wis. Stat. § 704.05(4) which only permits recovery against a "tenant" relative to removal of "Tenant's Fixtures," and does not apply to damage allegedly caused by MLC during occupancy of the Plant. As to Claim II, the Coop seeks recovery of alleged Breach of Contract limited to the time period November 2019 to December 2020.

7.     The duty of good faith and fair dealing is one of cooperation on the part of both parties, and the promise of the parties to not take action intentionally and purposefully that will prevent the other party from carrying out their side of the agreement or obtaining the benefits of the contract.

8.     MLC was not a *de facto* officer of the Coop.

9.     The Coop was not in an inequitable position of dependence, weakness of age, of mental strength, business, intelligence, knowledge of facts involved, or other conditions giving MLC an advantage over it.

10.    MLC was under no duty to winterize the Plant.

11.    MLC did not cause any damages to the Plant.

12.    MLC did not have a duty to restore the Plant.

13.    MLC did not breach its contract with the Coop.

14.    MLC did not improperly shift any production costs to the Coop.

15.    MLC did not breach its duty of good faith and fair dealing.

16.    MLC is not a fiduciary of the Coop, and did not owe the Coop a fiduciary duty.

17.    MLC did not breach any fiduciary duty owed to the Coop.

18.    There is no claim of damages owed to the Coop that sets off amounts owed to MLC
under its proof of claim.

19.    The Coop authorized all transactions from the Whey Account.


## ARGUMENT

As a preliminary matter, Wisconsin substantive law applies.  Interests in property are determined by state law.  *Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S. Ct. 1386, 1389, 118 L. Ed. 2d 39, 46 (1992); *Butner v. U.S.*, 440 U.S. 48, 54-55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (1979).  The same is true for contractual rights.  Contract rights are determined by state law, as generally, they have the same force that they would have in state court.  *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 20, 120 S. Ct. 1951, 1955, 147 L. Ed. 2d 13, 19 (2000); *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 615 (2005).

**I.     MLC HAD NO DUTY TO RESTORE THE PLANT, AND DID NOT FAIL TO DO SO.**

A.     <u>The Cheesemaking Services Agreement and Amendment Are Exactly That, a Services Agreement, and Not a Lease.</u>

The Coop's Complaint alleges that MLC failed in its duty to restore the Plant.  The Coop cites Section 704.05(4) Wis. Stats. for creating a duty of MLC to restore the premises at the termination of a tenancy.  (Dkt. 1, ¶ 79.)  Unfortunately for the Coop, there was no tenancy.  And moreover, any duty under Section 704.05(4) is limited to removal of fixtures, and not damages caused during occupancy.  Wis. Stat. § 704.05(4).

The Agreement here was not a lease.  A lease is when the landlord conveys a right of possession to the tenant in exchange for rent, which is an essential object of the lease.  *IFS Filing Sys. LLC v. 11225 Heather LLC*, 2019 WI App 1, ¶ 29, 385 Wis. 2d 211, 923 N.W.2d 176 (2018) (unpublished).  The Coop admitted it did not view the Agreement as a lease. (Mayer Dep. 44:9-13 ("Q: Does the Cooperative view the 2008 agreement as a lease?  A: No."))  The Coop's expert who confirmed she is experienced in analyzing leases also confirmed the Agreement is not a lease.  (Temkin Dep. 87:15-25; 88:1-11.)  The Amendment incorporated terms of the Agreement.  MLC never made any periodic payment of rent for the use of the Plant.  The only reference to "rent" was based on the amount of non-patron milk MLC bought and brought into the Plant for processing.  Neither the Agreement nor the Amendment called for rent or consideration to be paid to the Coop for occupancy of the Plant.  In fact, the Amendment called for the Coop to pay to MLC for its services.

There must be a showing the parties intended to assume a landlord-tenant relationship before concluding the parties' contract establishes such a relationship.  *M & I First Nat'l Bank v. Episcopal Homes Management*, 195 Wis. 2d 485, 500, 536 N.W.2d 175, 183 (1995).

In order to determine if there is a landlord-tenant relationship, the court must scrutinize the terms of the contract, being careful not to alter the true nature to the parties' agreement, and take into account the legal realities or consequences of the agreement.  *Williams v. Dist. Council of Madison, Inc.*, 2021 WI App 62, ¶¶ 15, 17, 399 Wis. 2d 174, 963 N.W.2d 909 (2021).  Notably, the Amendment:

- States the Amendment's purpose "is to provide for the production of cheese from milk…"

- Is titled "Cheesemaker Services Agreement."

- Incorporates terms from the Agreement, which:

  o specifies MLC is an independent contractor.

  o states the Coop will "[p]rovide the cheese factory including the living/office area… at no charge."

- Any payment of MLC to the Coop is not for use of the building, but rather based on the amount of non-patron milk MLC purchased for processing at the Plant.

- The remaining terms are all related to cheesemaking services (ie. price of cheese, storage terms for non-patron milk, access to facility to comply with federal regulations and health and safety of milk and cheese, allocation of cheesemaking expenses, addressing trademarks of cheese, milk production, quality standards for the milk and cheese, health protocols related to raw milk production.)

The dominant and primary purpose of the Agreement is for cheesemaking, and occupancy of the Plant is only an incidental consequence of the relationship.  *See M&I First Nat'l Bank*,

195 Wis. 2d at 504; *Williams v. Dist. Council of Madison Inc.*, 2021 WI App 62, ¶ 34, 399 Wis. 2d 174, 963 N.W.2d 909 (both analyzing related Adm. Code § ATCP 134.01(1)).  The Agreement is explicit that MLC is an independent contractor and the purpose of the Agreement is for cheesemaking.  While labels are not always controlling, the clarity of those assertions support the position that no landlord-tenant relationship was intended or created. *Williams*, 399 Wis. 2d at ¶ 36.  There are no terms that even viewed in isolation, indicate a rental agreement was intended.  If the parties intended the agreement to be a lease they could have easily done so.  They did not.  The Amendment is not a lease.  And MLC did not have a duty to restore the premises.

Moreover, the facts will show that on December 12, 2020, with both parties present, Doug Peterson from Cheese Manufacturing Specialist who was hired by the Coop, walked through the facility to educate the Coop how to properly winterize the equipment and Plant. Within the prior two weeks, MLC had processed cheese, and all equipment was working property.  The Coop took sole possession of the Plant after December 2020, and hired a property manager to oversee the Plant.  Any alleged damages occurred on the Coop's watch.

## B.    Coop Prevented MLC from Restoring the Plant.

MLC did not have a duty to restore the Plant, but even if it did, the Coop prevented it from doing so and should be barred from relief for "unclean hands."  For relief to be denied in equity under an "unclean hands" theory, the Coop's conduct must have caused the harm from which it seeks relief.  *Security Pacific Nat'l Bank v. Ginkowski*, 140 Wis. 2d 332, 339, 410 N.W.2d 589 (1987).  Upon the filing of the bankruptcy, Coop's counsel unequivocally informed MLC it "must refrain from taking any action in contravention of the Coop's rights

in and to the Facility, its fixtures, and the equipment owned by the Coop that is located in the Facility."  Furthermore, on December 31, 2020, the Coop's counsel informed MLC's counsel by email, "[y]our client has no right to access after today and under no circumstances may they enter or access the facility without approval of the Coop in advance and a member of the Coop present at all times."

The Coop demanded MLC vacate the Plant and remove their undisputed equipment, and barred access to the Plant thereafter.  Now, they seek alleged damages for MLC not remaining in the Plant to make repairs or to restore the Plant.  The Coop cannot have it both ways.  It cannot bar MLC from returning to the Plant and then tax MLC with alleged costs from failing to do so.  The Coop's conduct caused any alleged damages for not restoring the Plan, and has unclean hands.

## II.   MLC DID NOT BREACH ITS CONTRACT WITH THE COOP.

### A.   MLC Owed No Fiduciary Duty to the Coop.

Generally, there are two types of fiduciary relationships: (1) those specifically created by contract or a formal legal relationship such as principal and agent, attorney and client, trust and trustee, guardian and ward, and (2) those implied in law due to the factual situation surrounding the transactions and relationships of the parties to each other and to the questioned transactions.  *Production Credit Ass'n of Lancaster of Wis. v. Croft ("Croft")*, 143 Wis. 2d 746, 752, 423 N.W.2d 544, 546 (Ct. App. 1988).  The Coop must rely on a fiduciary duty implied in law because the Agreement specifically designates MLC as an independent contractor.  *Nationwide Advantage Mortg. Co. v. GSF Mortg. Corp.*, No. 13-CV-1420, 2015 U.S. Dist. LEXIS 130190 at *20, 2015 WL 5667205 (E.D. Wis. Sept. 25,

2015).  "Manifest in the existence of a fiduciary relationship is that there exists an inequality, dependence, weakness of age, of mental strength, business, intelligence, knowledge of facts involved, or other conditions giving to one an advantage over the other."  *Croft*, 143 Wis. 2d at 755-56.

In *Croft*, appellants alleged they were farmers that did not possess their lender's sophisticated and superior knowledge of the marketplace and finances and were compelled to rely upon the lender for financial advice.  *Croft*, 143 Wis. 2d at 756.  The appellate court upheld summary judgment because "[a] fiduciary relationship does not arise merely because advice and counsel is offered upon which a customer places trust and confidence."  *Croft*, 143 Wis. 2d at 757.  The *Croft* court also noted, that even though it took all allegations of the non-movant as true, evidence in the record demonstrated that the farmers were not first-time borrowers, and had the right to exercise their own judgment on business decisions even if they acted upon the lender's recommendations as financial advisors.  *Croft*, 143 Wis. 2d at n1.

Here, the facts will show that the patrons are not unsophisticated farmers.  They are individuals that run their own very complex businesses.  Some of the patrons, and board members had run their own cheese facilities.  The current president of the Coop, Jeremy Mayer, has an Associate Degree from the U.W. – Madison.  Mr. Mayer runs his own 240-acre farm with 120 head of cattle.  He actively budgets for his operation, and has multiple bank accounts and investment accounts.  Brad Timm, the current Secretary and patron of the Coop, also has a farming industry degree.  He has forty years of experience as a dairy farmer, and does monthly book work and record keeping for the operation, budgeting and accounting, submits information to accountants for tax purposes, and fills out governmental

forms.  He has participated on the board of Dairy Herd Improvement Association at the county level as president.  Mr. Timm also worked for two years as a cheese broker, taking and processing orders, setting up logistics for trucking between factories and buyers.  He participated on the board of other cooperatives.

Robert Bade, the current Treasurer of the Coop received a dual undergraduate degree from Illinois State University in food industry management and food industry science.  He went on to receive a Master's degree from U.W. – Madison in Dairy Science Management.  Mr. Bade purchased a rundown set of buildings, fixed them up and started his own farming operation where he does the accounting and bookkeeping, record keeping, budgeting and managed banking.  He worked as a project engineer for a milking equipment manufacturer, and worked as a field technician for automatic milking systems.  Not only did the members of the Coop have the business experience, intelligence, and knowledge of the facts, but they also hired and had the benefit of relying on their own financial professionals, accountants Peters & Peters, and their consultant, William Hughes, who has a Master's Degree in Agricultural Economics from the University of Wisconsin – Madison, and 20 years' experience working for the Wisconsin Department of Agriculture.

Each month, the Coop Board reviewed the financial information to determine cheese price, milk check figures, and amounts the Coop would need for capital expenses, upon which it voted.  And each year, an annual meeting was held with a financial presentation, which kept the members and the Board informed of the Coop's financial position and business dealings.  There was no inequity, dependence, weakness of mental strength, intelligence, and most certainly no absence of available facts for the Coop to make its own informed business decisions.  There was no fiduciary duty owed by MLC to the Coop.

Even if there was an alleged duty, the Coop must show the duty was breached and the breach caused the Coop's alleged damages. *Reget v. Paige*, 2001 WI App 73, ¶ 12, 242 Wis. 2d 278, 626 N.W.2d 302; *Berner Cheese Corp. v. Krug*, 2008 WI 95, ¶ 40, 312 Wis. 2d 251, 270, 752 N.W.2d 800. Here, there was no breach of fiduciary duty.

If there was a fiduciary duty, there is a constraint on the fiduciary to act in its own self-interest. *Groshek v. Trewin*, 2009 Wisc. App. 56, ¶ 16, 317 Wis. 2d 730, 768 N.W.62 (unpublished). The law prohibits the fiduciary to take advantage of its influence over the other, and imposes a duty to fully disclose the potential benefits and risks. *Groshek*, 317 Wis. 2d at ¶ 27. Here, MLC did not act in its own self-interest. MLC was paid 13% of the cheese and cream sales. Higher sales would mean higher payment to MLC. The Coop had control and authority at all times over the sale of its cheese. Moreover, MLC at all times provided and made available the material facts under which the Coop could obtain the prices of cheese, and costs. There was complete transparency. Even if there was a fiduciary duty, there was no breach of such duty.

Moreover, even if a duty is imposed, and a breach is found, there are no damages for such breach. The Coop received higher returns from how their cheese was sold as compared to their alternate theories alleged by the Coop. There are no damages for which the Coop can recover.

### B.   MLC Could Not Be and Was Not a *De Facto* Officer of the Coop.

While a de facto officer may be found in municipal law, the same is not true for corporate office appointments. Pursuant to Wis. Stat. § 185.35, officers of a cooperative are the annually elected president, vice president(s), secretary and treasurer, unless the articles of incorporation provide otherwise. Wis. Stat. § 185.35(1). The Articles of the Coop did not

call for any additional officers, and each of these four positions were filled and voted upon annually.  All cases referring to de facto officers are for offices that are governmental and municipal in nature.  The de facto officer doctrine does not apply to private corporations or cooperatives.

### C.   There Was No Improper Shifting of Costs

The Agreement and the subsequent Amendment governed the duties and obligations of the Coop and MLC.  "A court may not depart from the plain meaning of a contract where it is free from ambiguity.  In construing the terms of a contract, where the terms are plain and unambiguous, it is the duty of the court to construe it as it stands."  *Raasch v. City of Milwaukee*, 2008 WI App 54, ¶ 11, 310 Wis. 2d 230, 750 N.W.2d 492 (quotation omitted); *see also, e.g.*, *Nauga, Inc. v. Westel Milwaukee Co., Inc.*, 216 Wis. 2d 306, 314-315, 576 N.W.2d 573 (Ct. App. 1998) (quoting *Carney-Rutter Agency v. Central Office Bldgs.*, 263 Wis. 244, 252-253, 57 N.W.2d 348 (1953)) ("Men, in their dealings with each other, cannot close their eyes to the means of knowledge equally accessible to themselves and those with whom they deal, and then ask courts to relieve them from the consequences of their lack of vigilance.").

The parties negotiated the terms of the Amendment, and how costs would be applied. There were several in-person meetings, where members of each party went over possible scenarios and hypotheticals, and agreed upon the terms.  There were multiple email exchanges and draft agreements passed back and forth for review.  MLC adhered to the Amendment's terms.  The Coop has failed to provide any reports or opinions regarding the alleged improper shifting of costs.

The Amendment states, "[o]ther costs that are directly related to the cheese will be paid by actual amount used in cheesemaking.  These costs are milk powder, peppers, boxes,

pouches, bags and pickle tank pickup." The plain language of the Amendment calls for the Coop to pay the actual amount of the costs incurred in cheesemaking, and to not share those costs. There is no basis in the language of the Amendment for the Coop's position that those "other costs" should be assessed pro-rata.

### D.   Contractual Implied Duty of Good Faith and Fair Dealing

Contracts between parties imply good faith and fair dealing, and a duty of cooperation on both parties. *Beidel v. Sideline Software, Inc.*, 2013 WI 56 ¶ 27, 348 Wis. 2d 360, 842 N.W.2d 240. This duty is one of cooperation on the part of both parties. *Lang v. Tharpe*, 18-cv-1077-pp, 2022 U.S. Dist. LEXIS 90083, *67-68, 2022 WL 1597421 (citing *Ekstrom v. State*, 45 Wis. 2d 218, 222, 172 N.W.2d 660, 661 (1969) (internal citations omitted). The promise of the parties is to not take action intentionally and purposefully that will prevent the other party from carrying out his side of the agreement or obtaining the benefits of the contract. *Id*.

The Coop alleges various acts of MLC breached this duty. As explained above, there was no improper shifting of costs. The Coop has not and cannot provide any factual basis for any improper or otherwise unauthorized reimbursement and use of Whey Account funds to purchase equipment of MLC.

MLC did not refuse to provide financial information to the Coop to which it was entitled. MLC provided all supporting documents regarding its cheesemaking to the Coop and/or the Coop's agent, the accounting firm of Peters and Peters. The Coop cannot point to any information related to the Agreement, Amendment or MLC's cheesemaking services that was requested and not provided, or to which it did not already have ready access. The Coop

was in control of its cheese, milk and pricing at all times.  There is nothing to evidence MLC prevented them from receiving the fruits of the Agreement and Amendment.

MLC also did not unreasonably deny meaningful and regular access to the Plant.  The Coop could always access the Plant with reasonable prior notice and proper precautions.  The Plant was a regulated food processing facility.  For the health and safety of the cheese, whey and workers of the Plant, it was unreasonable and prohibited by federal regulations to have an open door where any farmer with manure on their boots could walk right in.  *See* 7 C.F.R. 58, sub. B. 46 FR 63203, Dec. 31, 1981.  MLC never denied the Coop access after a reasonable request.

The Coop alleges MLC reported profits on purchased milk, when it cost the Coop higher returns.  The Coop has been unable to articulate exactly what that means.  But the figures of the Coop's own expert show that the Coop's losses would have been greater if only non-purchased milk was supplied.  There is no factual basis for stating purchased milk cost the Coop more than its benefit.   The facts just do not support this allegation.  Furthermore, and reported profits were always reconciled by the Coop's accountant, Peters and Peters.  There were at all times a review of the cheesemaking expenses.  The Coop Board reviewed the financials each month, approved the cheese price and other costs and expenditures.  Financials were prepared by the Coop's accountants, not MLC.  And any figures provided by MLC were reconciled by the Coop's accountants, and reviewed by the Coop Board.

The facts will also show the Court that the Coop at all times, and as expressly stated in the Agreement, owned the patron milk and the cheese made therefrom.  The Coop had the sole authority to sell its cheese, and each and every month the Coop Board approved a 3.5

price that set the price for the cheese that month.  The Coop at all times had all information related to the costs of the cheesemaking and its milk.  And detailed breakdowns were sent each month to the Coop's patrons with their milk checks.  Not only that, but the average price the Coop was paid for its cheese was comparable to or higher than UDSA prices, which are survey averages that take into consideration delivered prices.  The Coop received a comparable price to those cheeses even when it did not incur the cost of transporting its cheese, storing its cheese, or marketing/advertising costs, or other related-delivered price cheese costs.

## **CONCLUSION**

The Coop has failed to meet its burden on all counts of the Complaint.  The Coop is not entitled to any damages from MLC and therefore MLC's claim should not be setoff by any amounts.  All Counts of the Complaint should be denied, and the Coop's objection to MLC's proof of claim, overruled.

Dated 28th day of September, 2022.

**MURPHY DESMOND S.C.**
Attorneys for the Defendant, Maple Leaf Cheesemakers, Inc.

By: /s/ *Kristin K. Beilke*
Scott G. Salemi
ssalemi@murphydesmond.com
Kristin K. Beilke
kbeilke@murphydesmond.com
33 East Main Street Suite 500
P.O. Box 2038
Madison, WI 53701-2038
(608) 257-7181

4876-3606-2244, v. 1